Richard A. Smith
SMITH & LOWNEY, PLLC
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| RE SOURCES FOR SUSTAINABLE COMMUNITIES, | ) ) ) | |
| Plaintiff, | ) | COMPLAINT |
| v. | ) ) | |
| PACIFIC INTERNATIONAL TERMINALS, INC., | ) ) ) | |
| Defendant. | ) ) | |
| ——————————————— | ) | |

## I.    INTRODUCTION

1.    This action is a citizen suit brought under Section 505 of the Clean Water Act ("CWA") as amended, 33 U.S.C. § 1365.  Plaintiff RE Sources for Sustainable Communities ("RE Sources") seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witnesses' fees, for Defendant Pacific International Terminals, Inc.'s ("PIT") repeated and ongoing unlawful acts proscribed by Section 301(a) of the CWA, 33 U.S.C. § 1311(a), specifically, the discharge of dredged or fill material into navigable waters without authorization by a permit issued under Section 404, 33 U.S.C. § 1344, by the United States Army Corps of Engineers ("COE").  .

COMPLAINT - 1

## II.  JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).  The relief requested herein is authorized by 33 U.S.C. §§ 1319(d) and 1365(a).

3.      Under Section 505 (b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff notified Defendant of Defendant's violations of the CWA and of Plaintiff's intent to sue under the CWA by letter dated and postmarked October 3, 2011 and delivered October 5, 2011 ("Notice Letter").  A copy of the Notice Letter is attached to this complaint as Exhibit 1.  The allegations in the Notice Letter are incorporated herein by this reference.  Plaintiff notified the Defendant's Registered Agent, the Administrator of the United States Environmental Protection Agency ("USEPA"), the Administrator of USEPA Region 10, and the Director of the Washington Department of Ecology ("WDOE") of its intent to sue Defendant by mailing copies of the Notice Letter to these officials on October 3, 2011.

4.      More than sixty days have passed since the notice was served and the violations complained of in the Notice Letter are continuing or are reasonably likely to continue to occur. Defendant is in violation of the CWA.  No agency has commenced any action constituting diligent prosecution to redress these violations.

5.      The source of the violations complained of is located in Whatcom County, Washington, within the Western District of Washington, and venue is therefore appropriate in the Western District of Washington pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1).

COMPLAINT - 2

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

### III.    PARTIES

6.    Plaintiff, RE Sources for Sustainable Communities, is suing on behalf of itself and its member(s).  RE Sources is a non-profit corporation organized under the laws of the State of Washington.  RE Sources is a membership organization and has at least one member who is injured by Defendant's violations.  RE Sources is dedicated to protecting and preserving the environment of Washington State, especially the quality of its waters.

7.    Plaintiff has representational standing to bring this action.  The recreational, economic, aesthetic and/or health interests of RE Sources and its member(s) have been, are being, and will be adversely affected by Defendant's violations of the CWA.  The relief sought in this lawsuit can redress the injuries to these interests.

8.    Defendant is a corporation authorized to conduct business under the laws of the State of Washington.

9.    Defendant owns the property at Cherry Point, approximately 18 miles northwest of the City of Bellingham, five miles west of Ferndale, and 17 miles south of the US-Canada border where the violations of the CWA took place.

### IV.    FACTS

10.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person, unless in compliance with the provisions of the CWA.  Section 301(a) prohibits, inter alia, such discharges not authorized by Section 404 of the CWA, 33 U.S.C. § 1344.

11.    Section 404 of the CWA, 33 U.S.C. § 1344, provides the United States Army Corps of Engineers ("COE") with the authority to implement the permit program for the discharge of dredged or fill material into navigable waters.

COMPLAINT - 3

12.     Defendant has violated and continues to violate Section 301(a) of the CWA, 33 U.S.C. §§ 1311(a), by discharging dredged or fill material to the waters of the United States, which remains in place, without the required permit from COE under Section 404, 33 U.S.C. § 1344.

13.     On March 5, 2009, Defendant received notice from COE that "wetlands and jurisdictional streams exist on [Defendant's] property," and that "[t]hese wetlands have a significant nexus to downstream traditional navigable waters (the Strait of Georgia) and, as such are regulated by the Corps under Section 404 of the Clean Water Act."  Letter from COE to PIT (Appendix B of Revised Restoration Plan, October 11, 2011), March 5, 2009.

14.     In violation of these referenced legal obligations, between approximately July 5, 2011 and July 22, 2011, Defendant tracked heavy equipment through forested and shrub wetland areas, clearing access pathways with an average width of 17 feet, without a permit.  During the same period and also without a permit, Defendant drilled boreholes and conducted other work associated with Defendant's geotechnical investigation at the wetlands on the site of the Gateway Pacific Terminal project.

15.     Defendant bulldozed over a diverse assortment of trees and shrubs, ripped up large root wads, flung soil mounds and discarded debris in wetlands without a permit.

16.     The total impacted area of forest and shrub wetlands was at least 170,756 square feet, or 3.9 acres.  Memo from AMEC to COE, August 15, 2011.  This impacted area is navigable waters subject to the jurisdiction of the CWA and COE.

17.     Defendant's unpermitted actions uncovered and damaged shell midden deposits of up to 2,500 years old, on a site inhabited by the Lummi Nation beginning approximately 3,500 years ago.  The Lummi Nation considers the site within the Lummi homeland and a habitation

COMPLAINT - 4

property with cultural significance, expressing a strong interest in protecting the site.  Damage

Assessment Report, September 9, 2011.

18.     A comprehensive summary of the excavations and cultural finds at Cherry Point

has never been completed, but reported finds include remnants of a plank house, fish drying

racks, fish traps, smoking pits, artifact manufacturing areas, domestic hearths, fire modified rock

pavements, human burials and more than 2500 artifacts (including grinding stones, mauls, hand

axes, projectile points, spear points, fishing weights, fishing hooks, needles, and others).

Damage Assessment Report, September 9, 2011

19.     On August 8, 2011, COE inspector Randel Perry concluded that Defendant's

activity "appears to be in violation of the Clean Water Act because . . . [t]he work does not meet

all the terms and conditions of NWP 6 and 33, particularly: National Condition for coordination

for historic properties and cultural resources [and] National Condition for completing

notification procedure requirements prior to commencing work."  Investigation Report and

Conclusions, Randel Perry, August 8, 2011.

20.     On August 8, 2011, Mr. Perry observed ". . . a discharge of fill in wetlands –

primarily rootwads (with significant amount of dirt attached) sidecast into the wetlands adjacent

to the roads and some minor grading.  No authorization was issued for this work."  Email from

Randel Perry to Michelle Walker, et al., August 8, 2011.

21.     On August 17, 2011, Whatcom County Planning and Development Services

issued a Notice of Violation against Defendant for conducting regulated activities without prior

review or permit approval and imposed total penalties of $2000, reflecting a "severe impact

fine."

COMPLAINT - 5

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

22.     On August 30, 2011, Bruce Estok, Colonel with the COE, sent Defendant a stop-work letter which stated the COE had determined that Defendant placed fill in wetlands without a Department of the Army permit, a violation of Federal law.  "Therefore the work [Defendant] performed was not authorized by any NWP and is in violation of the Clean Water Act."  Letter from Bruse Estok to PIT, August 30, 2011

22.     The vicinity of the fill activity and the affected waters are used by the citizens of Washington and visitors, as well as at least one of Plaintiff's members, for recreational activities, including boating, biking, fishing and nature watching, and educational activities, including archaeological research.  Plaintiff' member(s) also derive(s) aesthetic benefits from the affected waters.  Plaintiff's and its members' enjoyment of these activities and waters is diminished by the degraded state of the affected waters and by Defendant's contributions to such degraded state.  For example, Plaintiff's members are concerned that Defendant's violations have diminished the value of the affected wetlands as wildlife habitat, thus interfering with these individuals' enjoyment of nature watching in the vicinity.

23.     Defendant has violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging dredged or fill material without a permit issued under Section 404, 33 U.S.C. § 1344.  Defendant's violations of the CWA are additionally set forth in the Notice Letter, attached hereto as Exhibit 1, and are incorporated herein by this reference.  Defendant's violation is ongoing as the dredged or fill material it discharged to the wetlands remains in navigable waters, and Defendant has obtained no Section 404 permit coverage.

24.     Defendant's violations of the CWA degrade the environment and the water quality of the receiving water bodies.

COMPLAINT - 6

Smith & Lowney, p.l.l.c.
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

25.    Defendant's violations were avoidable had Defendant been diligent in complying with its legal obligations.

26.    Defendant has benefited economically as a consequence of its violations and its failure to implement improvements at the facility.

### V.    CAUSE OF ACTION

23.    The preceding paragraphs and the allegations in the Notice Letter are incorporated herein.

24.    Defendant's violations of the CWA described herein and in the Notice Letter constitute illegal activity proscribed by section 301 of the Clean Water Act, 33 U.S.C. §§ 1311. An unlawful act under section 301 constitutes an "effluent standard or limitation," violation of which is enforceable by Plaintiff under section 505(a)(1), 33 U.S.C. § 1365(a)(1).

25.    On information and belief, the violations committed by Defendant are ongoing or are reasonably likely to continue to occur.  Any and all additional violations of the CWA which occur after those described in Plaintiff's Notice Letter but before a final decision in this action should be considered continuing violations subject to this Complaint.

26.    Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendant is likely to continue to violate the CWA to the further injury of the Plaintiff, its member(s) and others.

27.    A copy of this Complaint is being served upon the Attorney General of the United States and the Administrator of the USEPA as required by 33 U.S.C. § 1365(c)(3).

### VI.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

COMPLAINT - 7

A.      Issue a declaratory judgment that Defendant has violated and continues to be in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311, for discharging dredged or fill material to navigable waters without the permit required under Section 404, 33 U.S.C. § 1344;

B.      Enjoin Defendant from conducting additional geotechnical testing or other activities at its Cherry Point property in a manner that results in further violations of the Clean Water Act;

C.      Order Defendant to take specific actions to remediate the environmental harm caused by its violations;

D.      Order Defendant to pay civil penalties of $37,500.00 per day of violation for each violation committed by Defendant pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. § 19;

H.      Award Plaintiff their litigation expenses, including reasonable attorneys' and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

I.      Award such other relief as this Court deems appropriate.

RESPECTFULLY SUBMITTED this 12th day of December, 2011.

Smith & Lowney, pllc


By: *s/Richard A. Smith*
Richard A. Smith, WSBA #21788
Attorneys for Plaintiff
2317 E. John St.,
Seattle, WA 98112
Tel: (206) 860-2124
Fax: (206) 860-4187
E-mail: rasmithwa@igc.org

COMPLAINT - 8

EXHIBIT 1

# SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WASHINGTON 98112
(206) 860-2883, FAX (206) 860-4187

October 3, 2011

**Via Certified Mail - Return Receipt Requested**
Managing Agent
Pacific International Terminals, Inc.
1131 SW Klickitat Way
Seattle, WA 98134

Re:     **NOTICE OF INTENT TO FILE SUIT UNDER THE CLEAN WATER ACT**

Dear Managing Agent:

This sixty day notice of intent to file a citizen suit against Pacific International
Terminals, Inc. ("PIT") under Section 505 of the Clean Water Act ("CWA"), 33 USC § 1365,
for the violations described below is served on behalf of RE Sources for Sustainable
Communities, 2309 Meridian St., Bellingham, WA 98225, (360) 733-8307.  Any response to
this letter should be addressed to the undersigned counsel for RE Sources for Sustainable
Communities at the letterhead address.

PIT has violated and continues to violate Sections 301(a) and 404 of the CWA, 33
U.S.C. §§ 1311(a) and 1344, by discharging dredged or fill material to the waters of the
United States without the required permit from the United States Army Corps of Engineers.
This dredged or fill material has been discharged in the course of clearing access paths,
drilling boreholes, and other work associated with PIT's geotechnical investigation in
approximately 2.8 to 9.1 acres of wetlands located at the site of the Gateway Pacific Terminal
project at Cherry Point, approximately 18 miles northwest of the City of Bellingham, five
miles west of Ferndale, and 17 miles south of the US-Canada border, in Sections 17, 18, and
19, Township 39 North, Range 01 East.  The site location and a description of PIT's activities
resulting in the discharge are provided in the August 16, 2011, SEPA Environmental
Checklist submitted by PIT to Whatcom County, and appended to this notice of intent to sue
as Exhibit A.  *See,* Exh. A at Fig. 1 for site location.  Exhibit A to this notice letter also
includes second map identifying at least some areas where PIT has discharged dredged or fill
material to wetlands at this location.  See, Exh. A at "Exhibit B" ("GEOTECHNICAL
INVESTIGATION SITE ACCESS AS-BUILD PLAN AND WETLAND ACCESS
AREAS").  PIT conducted the work resulting in the discharge between approximately July 1
and July 22, 2011.  All discharged dredged or fill material remains in place in the wetlands,
which are waters of the United States, and the violations are ongoing.

The above-described violations reflect only what information currently available to us indicates. These violations are ongoing. We intend to sue for all violations, including those yet to be uncovered and those committed after the date of this notice of intent to sue.

Under Section 309(d) of the CWA, 33 USC § 1319(d), and 40 C.F.R. 19, each of the above-described violations subjects the violator to a penalty of up to $37,500 per day. In addition to civil penalties, we will seek injunctive relief under Sections 505(a) and (d) of the CWA, 33 USC § 1365(a) and (d), and such other relief as is permitted by law. Also, Section 505(d) of the CWA, 33 USC § 1365(d), permits prevailing parties to recover costs including attorney's fees.

RE Sources for Sustainable Communities believes that this NOTICE OF INTENT TO SUE sufficiently states grounds for filing suit. We intend, at the close of the 60-day notice period, or shortly thereafter, to file a citizen suit against Pacific International Terminals, Inc. under Section 505(a) of the Clean Water Act for violations.

During the 60-day notice period, we would be willing to discuss effective remedies for the violations in this letter and settlement terms. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within 10 days of receiving this notice so that a meeting can be arranged and so that negotiations may be completed before the end of the 60-day notice period. We do not intend to delay the filing of a complaint if discussions are continuing when the notice period ends.

Very truly yours,

SMITH & LOWNEY, P.L.L.C.

By: _____

Richard A. Smith

Cc (via certified mail, return receipt requested):

Lisa Jackson, Administrator, U.S. EPA
Dennis McLerran, Region 10 Administrator, U.S. EPA
Ted Sturdevant, Director, Washington Department of Ecology
Kyle B. Lukins, Registered Agent, 1131 SW Klickitat Way, Seattle, WA 98124

Cc (via regular mail):

Randel Perry, COE

SEP 2011-00067

**WHATCOM COUNTY**
Planning & Development Services
5280 Northwest Drive,
Bellingham, WA 98226-9097
360-676-6907, TTY 800-833-6384
360-738-2525 Fax



**J.E. "Sam" Ryan**
Director

## SEPA Environmental Checklist

Purpose of Checklist:

The State Environmental Policy Act (SEPA), Chapter 43.21C RCW, requires all governmental agencies to consider the environmental impacts of a proposal before making decisions. An environmental impact statement (EIS) must be prepared for all proposals with probable significant adverse impacts on the quality of the environment. The purpose of this checklist is to provide information to help you and the agency identify impacts from your proposal (and to reduce or avoid impacts from the proposal, if it can be done) and to help the agency decide whether an EIS is required.

Instructions for Applicants:

This environmental checklist asks you to describe some basic information about your proposal. Governmental agencies use this checklist to determine whether the environmental impacts of your proposal are significant, requiring preparation of an EIS. Answer the questions briefly, with the most precise information known, or give the best description you can.

You must answer each question accurately and carefully, to the best of your knowledge. In most cases, you should be able to answer the questions from your own observations or project plans without the need to hire experts. If you really do not know the answer, or if a question does not apply to your proposal, write "do not know" or "does not apply". Complete answers to the questions now may avoid unnecessary delays later.

Some questions ask about governmental regulations, such as zoning, shoreline, and landmark designations. Answer these questions if you can. If you have problems, the governmental agencies can assist you.

The checklist questions apply to all parts of your proposal, even if you plan to do them over a period of time or on different parcels of land. Attach any additional information that will help describe your proposal or its environmental effects. The agency to which you submit this checklist may ask you to explain your answers or provide additional information reasonably related to determining if there may be significant adverse impact.

Use of checklist for nonproject proposals:

Complete this checklist for nonproject proposals, even though questions may be answered "does not apply". IN ADDITION, complete the SUPPLEMENTAL SHEET FOR NON PROJECT ACTIONS (Part D).

To Be Completed                                    For Evaluation
By Applicant                                    Agency Use Only

For non project actions, the reference in the checklist to the words "project", "applicant", and "property or site" should be read as "proposal", proposer", and "affected geographic area" respectively.

## A. Background

1. Name of Proposed Project, if applicable:

   **Terrestrial Geotechnical Investigation, Gateway Pacific Terminal**

2. Name of applicant: Pacific International Terminals, Inc.; Skip Sahlin
   Applicant phone number: (206) 654-3510
   Applicant address: 1131 SW Klickitat Way, Seattle, WA 98134

3. Contact name: Cliff Strong, AMEC.
   Contact phone number: 425.368.0852
   Contact address: 11810 North Creek Parkway N, Bothell, WA 98011

4. Date Checklist prepared:
   **15 August 2011**

5. Agency requesting checklist: **Whatcom County**

6. Proposed timing or schedule (including phasing, if applicable):
   **Completion of the remaining geotechnical program is anticipated to take approximately 6 weeks.**

7. Do you have any plans for future additions, expansion, or further activity related to or connected with this proposal?     Yes ☒     No ☐
   If yes, explain.
   **Proposed future development on the property would likely include the construction and operation of the Gateway Pacific Terminal, a multimodal marine terminal, including a deep-draft wharf with access trestle and other associated upland facilities, for the export and import of multiple dry bulk commodities.**

8. List any environmental information you know about that has been prepared, or will be prepared, directly related to this proposal.
   **A Terrestrial Geotechnical Investigation Work Plan was developed in 2008 and approved by Whatcom County.**

9. Do you know whether applications are pending for governmental approvals of other proposals directly affecting the property covered by your proposal? Yes ☒     No ☐
   If yes, explain.
   **Permit applications have been submitted to Whatcom County for a Major Project Permit and Substantial Development Permit. Other permits are also pending with state and federal agencies for the development of the Gateway Pacific Terminal project.**

10. List any government approvals or permits that will be needed for your proposal, if known.
    **The following approvals and permits may be required for this activity:**
    - **Whatcom County Land Disturbance Permit**

2

To Be Completed
By Applicant

For Evaluation
Agency Use Only

- **WA Department of Natural Resources - Forest Practices Permit**
- **WA Department of Ecology - NPDES General Construction Stormwater permit**
- **US Army Corps of Engineers – Under review by USACE**

11. Give a brief, complete description of your proposal, including the proposed uses and the size of the project and site. There are several questions later in this checklist that ask you to describe certain aspects of your proposal. You do not need to repeat those answers on this page.

**Pacific International Terminals, Inc. is applying for permits required to perform geotechnical investigation for the proposed Gateway Pacific Terminal (Terminal) in the Cherry Point Urban Growth Area, Whatcom County, Washington. The County issued two Notices of Corrective Action; one on August 2 – Land Clearing, and one on August 3, 2011 – Critical Areas.**

**This SEPA Checklist is submitted to Whatcom County as required to provide information for their assessment of potential environmental impacts from the geotechnical investigation, including vegetation clearing for site access. Information in this Checklist describes geotechnical work already completed along with the remaining portions of the geotechnical investigation yet to be completed**

### Project Description

**The geotechnical investigation entails advancing approximately 50 boreholes and approximately 20 cone penetration tests (CPT) to evaluate subsurface soil and groundwater conditions. The investigation will provide information regarding subsurface conditions that will be critical for design of future development on the property. Geotechnical boreholes are generally about 8 inches in diameter and extend to depths between 80 and 130 feet. The cone penetration tests push a 1.4-inch diameter rod into the ground to depths up to about 100 feet. Two shallow test pit excavations, to depths of about 15 feet will be used to confirm near-surface soil profiles. The locations of the explorations are shown on <u>Exhibit B: Geotechnical Investigation Site Access As-Built Plan & Wetland Impact Areas</u>.**

**The boreholes and CPT explorations are advanced with track-mounted equipment, which are approximately 8 feet wide by 25 feet long. To allow equipment to access test locations in forested and shrub vegetated areas, access paths approximately 17 feet wide are required to accommodate the equipment and provide safe working clearance.**

**To prepare access pathways in forest and shrub areas, a tracked excavator was used to knock over trees and to pick up smaller vegetation and push it to the perimeter of the access path. These access paths are temporary and no improvements were made to create roadways. Following initiation of clearing, data collection was begun and boreholes and CPT work initiated. Access to all borehole locations was completed while approximately half of the intended data was collected when the field work was halted on July 22, 2011.**

### Plan Development and Implementation

**To develop the geotechnical investigation plan, access routes were drawn onto base maps and evaluated to determine the least amount of clearing disturbance and to**

To Be Completed
By Applicant

For Evaluation
Agency Use Only

avoid wetlands, streams, and buffers. Consideration was made to avoid direct vegetation impacts by locating the proposed geotechnical boreholes to the extent feasible outside of wetlands and heavily vegetated areas; however, complete avoidance of wetland areas was not practicable because much of the proposed terminal development area is wetland, and geotechnical data is needed for subsurface conditions in those locations. When a boring location was located within a wetland, existing roads and pastures and hay fields were used to the extent possible as access routes to minimize vegetation disturbance throughout the property. Only when no other alternative could be identified were access routes placed through forested or shrub vegetated wetland areas.

Clearing for access paths to the geotechnical boring locations was initiated on July 5, 2011 and was completed on July 22, 2011. In total, approximately 23,132 lineal feet of access paths were cleared in both uplands and in wetland forest and shrub areas. The average width of clearing was determined to be 17 feet and the total area cleared was approximately 9.1 acres. Of this total cleared area, approximately 2.8 acres of vegetation and soil in forested and shrub wetlands and approximately 0.96 acres of wetland buffers were disturbed. At this time, no additional access paths are anticipated to be necessary to complete the geotechnical investigation.

Borings were made on-site starting on July 7, 2011 through July 22, 2011. As of July 22, 19 (of the 50 planned) boreholes and 19 (of the 20 planned) CPT explorations were completed. Several boreholes were in progress and are not completed. Two test pit explorations were also completed.

To reduce the risk of erosion or sedimentation from cleared areas, best management practices, including stabilized construction entrances and covering bare soils, are planned to be implemented. Bare soil areas are planned to be covered by hydroseeding. Seed mixes are planned to include fast germinating grasses and forbes suitable for forest or shrub wetlands and a separate seed mix for forested upland areas. Entrance areas are planned to be stabilized with chipped wood and bark.

Future geotechnical testing includes advancing approximately 30 boreholes as shown in Exhibit B, which would take approximately 6 work weeks.

Following completion of field testing, cleared areas are planned to be restored. In wetland areas, side cast rootwads and some root mats with soil will be moved to the clearings to reduce the size of adjacent piles. Plantings appropriate to forested wetlands or shrub areas will be installed. In upland areas, trees seedlings will be planted to accomplish reforestation at a survival rate of 190 stems per acre for at least one growing season to meet DNR reforestation requirements.

12. Location of the proposal. Give sufficient information for a person to understand the precise location of your proposed project, including a street address, if any, and section, township, and range, if known. If a proposal would occur over a range of area, provide the range or boundaries of the site(s). Provide a legal description, site plan, vicinity map, and topographic map, if reasonably available. While you should submit any plans required by the agency, you are not required to duplicate maps or detailed plans submitted with any permit applications related to this checklist.

To Be Completed
By Applicant

For Evaluation
Agency Use Only

The project area is located at Cherry Point, a small promontory of land on the eastern shore of the Strait of Georgia on the west coast of Washington State. The project area is located approximately 18 miles northwest of the City of Bellingham, 5 miles west of Ferndale, and 17 miles south of the US-Canada border (Figure 1). The area is located in Sections 17, 18, and 19; Township 39 North; Range 01 East.



Figure 1: Vicinity Map

5

To Be Completed
By Applicant

For Evaluation
Agency Use Only

B.  ENVIRONMENTAL ELEMENTS

1.  Earth

a.  General description of the site (circle one): Flat, rolling, hilly, steep slopes, mountainous, other ___.

b.  What is the steepest slope on the site (approximate percent slope)?
**Unstable slopes are not present in the project area except for areas along the shoreline. Steep shoreline bluff slopes are approximately 45 to 60% with steeper bluffs on the western most extent of the property. Exhibit B shows topography of the site. No geotechnical investigation is planned on the steep slopes.**

c.  What general types of soils are found on the site (for example, clay, sand, gravel, peat, muck)? If you know the classification of agricultural soils, specify them and note any prime farmland.
**The Natural Resources Conservation Service (NRCS) has identified and mapped seven soil series within the project area: Birchbay silt loam, Edmonds-Woodlyn loam, Hale silt loam, Kickerville silt loam, Neptune very gravelly sandy loam, Whatcom silt loam, and Whitehorn silt loam. The areas used for pasture or hayfields on site are not considered prime farmland.**

d.  Are there surface indications or history of unstable soils in the immediate vicinity? If so, describe.
**Unstable soils occur at the shoreline bluffs on the southwestern portion of the property at the Strait of Georgia. No geotechnical drilling would occur on these steep bluffs.**

e.  Describe the purpose, type and approximate quantities of any filling or grading proposed. Indicate source of fill.
**Any filling that would occur would be temporary and would occur as a result of clearing for access areas. No fill materials have been or would be imported to the site, with the exception of wood chips/bark proposed to stabilize site entrances.**

**Clearing of access paths resulted in disturbance to soils. We estimated approximately 4,369 cubic yards of soil was displaced from the cleared paths. The material was sidecast to locations immediately adjacent to the path and no material was removed from the site.**

f.  Could erosion occur as a result of clearing, construction, or use? If so, generally describe.
**The site is largely flat and soils do not have indicators of high erodability. However, soil erosion is possible as a result of stormwater flowing over cleared access paths if precipitation is great enough.**

6

To Be Completed                                                                For Evaluation
By Applicant                                                                   Agency Use Only

The clearing work was done during the drier time of the year (July) and at present there are no indicators on site, such as sediment drift or rilling, which would indicate soil has moved from the access paths.

g.  About what percent of the site will be covered with impervious surfaces after project construction (for example, asphalt or buildings)?
None of the site will be covered with impervious surfaces such as buildings or asphalt following this project. Geotechnical investigation involved drilling and providing access to drilling locations. No construction of structures was done or is planned.

h.  Proposed measures to reduce or control erosion, or other impacts to the earth, if any:
Best Management Practices (BMPs) for erosion control will be installed in the cleared areas. Specifically, two BMPs are proposed to be implemented: Temporary Seeding and Stabilized Construction Entrances. Other BMPs would be installed as needed, such as coir logs or straw bales.

Temporary Seeding (BMP C120) is proposed as the BMP to be used for stabilizing soils. The BMP would be installed by a hydroseeding machine at an approximate application rate of 1,000 lb/ac wood fiber mulch, 150 lb/ac wet area seed, 200 lb/ac of 25-5-15 fertilizer, and 15 lb/ac tackifier.

A wetland seed mix is proposed for wetland areas and comprised of (by weight):
        15%    Sterile Wheatgrass
        20%    Seaside Colonial Bentgrass (*Agrostis capillaris*)
        35%    Meadow Foxtail (*Alopecurus pratensis*)
        10%    Marsh Clover (*Trifolium wormskjoldii*)
        20%    Redtop Bentgrass (*Agrostis stolonifera*)

The upland seed mix is proposed for other areas and comprised of:
        60%    Blue Wildrye (*Elymus glaucus*)
        30%    Native Red Fescue (*Festuca rubra*)
        10%    Western Fescue (*Festuca occidentalis*)

No water is available onsite and must be obtained in the vicinity of Ferndale and trucked to the site. Access paths will be inspected for excessive rutting prior to hydroseeding and remedied by hand raking, if needed.

Stabilized Construction Entrances (BMP C105) would be installed using mixed wood/bark chips at site entrances to prevent tracking of dirt onto County roads. Vehicles accessing the site from County roads will cross a 100-foot-long strip of wood/bark chips of an appropriate width to accommodate the hydroseed truck. Tracking of dirt onto public roads would be minimized and any dirt or debris tracked onto roadways would be removed.

7

To Be Completed
By Applicant

For Evaluation
Agency Use Only

2.  Air

   a.  What types of emissions to the air would result from the proposal (i.e. dust, automobile odors, and industrial wood smoke) during construction and when the project is completed? If any, generally describe and give approximate quantities if known.
**During construction activities there would be increased exhaust and dust particle emissions to the ambient air from geotechnical, clearing, and hydroseed equipment.**

   **No air emissions would result from the completed project.**

   b.  Are there any off-site sources of emissions or odor that may affect your proposal? If so, generally describe.
**No, there are not off-site sources that would affect the geotechnical investigation.**

   c.  Proposed measures to reduce or control emissions or other impacts to air, if any:
**Motorized equipment will be maintained to achieve peak performance and reduce the amount of emissions generated. Motorized equipment will be shut off during periods of non-use. No additional measures are proposed to reduce or control air emissions because the quantities and impacts will be negligible.**

3.  Water

   a.  Surface:

      1)  Is there any surface water body on or in the immediate vicinity of the site (including year-round and seasonal streams, saltwater, lakes, ponds, wetlands)? If yes, describe type and provide names. If appropriate, state what stream or river it flows into.
**The project site is adjacent to the Strait of Georgia. There are 7 streams on-site. Streams 1 (WRIA # 01.0100) and 2 (WRIA # 01.0101) are first order streams and flow into the Strait of Georgia. Streams 3 through 7 flow in roadside ditches and drain to either Stream 1 or 2. The only fish bearing stream on site is the lowest reach of Stream 1 south of Henry Road (Type Fs). Nine additional drainages flow through the site and drain to one of the roadside streams or Stream 1 or 2. None of these nine drainages (Stream 1 north of Henry Road, Stream 2, all other Streams and Ditches) support fish. See Exhibit B for locations of streams and drainages.**

**Wetlands on-site are shown on Exhibit B. Wetlands 1, 4B, 4C, 5B, 7B, 8B, 10B, 11B, 12, 13C, 13F, 13G, and 14 are depressional wetlands. Wetlands 2, 3, 4A, 4D, 4E, 4F, 5A, 5C, 6, 7A, 8A, 9A&C, 10A, and 13D are slope wetlands. Wetlands 11A, 13A, and 13E are riverine wetlands. All wetlands are hydrologically associated**

to roadside drainages or to Streams 1 or 2. Most of the wetlands are Class III, with the exception of wetlands in the lower reach of Stream 1 (Class II) and the coastal lagoon (Class I).

2) Will the project require any work over, in, or adjacent to (within 200 feet) the described waters? If yes, please describe and attach available plans.
**See Exhibit B for locations of impacts to wetlands and wetland buffers due to clearing for access paths. The total area of clearing in wetlands was 120,649 square feet or approximately 2.8 acres. No clearing occurred in buffers (though vegetation and soil were pushed into some areas).**

**Clearing occurred within 200 feet of Streams 3, 4, 5 and 6 and Drainages 1, 3, 4, and 7, but no clearing for geotechnical investigations occurred within these streams. No clearing occurred within 200 feet of Stream 1 or Stream 2. See Exhibit B for locations of clearing for access paths.**

3) Estimate the amount of fill and dredge material that would be placed in or removed from surface water or wetlands and indicate the area of the site that would be affected. Indicate the source of fill material.
**Clearing resulted from pushing trees and shrubs to the sides of access paths. Root wads of uprooted trees, displaced vegetation, and soil mounds associated with vegetation removal are considered fill in wetlands areas.**

**We estimate the total amount of fill in wetland areas from the vegetation debris and soil displacement at 928 cubic yards. This was calculated using an average depth of 0.5 feet covering approximately 1.2 acres lying adjacent to the cleared access paths. As indicated the fill was from the access paths on-site and no fill material was imported to the site.**

**No dredge material was placed or removed from any waterbodies.**

4) Will the proposal require surface water withdrawals or diversions? Give general description, purpose, and approximate quantities if known.
**No surface water withdrawals or diversions are needed.**

5) Does the proposal lie within a 100-year floodplain? If so, note location on the site plan.
**No.**

6) Does the proposal involve any discharges of waste materials to surface waters? If so, describe the type of waste and anticipated volume of discharge.
**No discharges of waste materials to surface waters are involved.**

b. Ground:

1) Will ground water be withdrawn, or will water be discharged to ground water? Give general description, purpose, and approximate quantities if known.
**Drilling of geotechnical boreholes results in minor incidental withdrawals of groundwater during drilling. The groundwater is discharged to soils on the site. Once the drilling is completed no further discharges occur. Boreholes are drilled and closed according to Ecology guidelines.**

**Approximately 6 of the boreholes will be completed as shallow groundwater monitoring wells. In the future, following completion of the geotechnical investigation, small amounts of groundwater (1 to 2 liters) will be withdrawn manually about four times a year from each of the wells for water quality analysis.**

2) Describe waste material that will be discharged into the ground from septic tanks or other sources, if any (for example: Domestic sewage; industrial, containing the following chemical... agricultural: etc.). Describe the general size of the system, the number of such systems, the number of houses to be served (if applicable), or the number of animals or humans the system(s) are expected to serve.
**Drilling mud from traditional borehole exploration is discharged to the soil surface as the borehole is drilled. This material consists of mixed clays suspended in water and serves to reduce friction created in the subsurface by boring. Approximately 2 gallons per bore hole is discharged. No other material would be discharged.**

c. Water Runoff (including stormwater):

1) Describe the source of runoff (including stormwater) and method of collection and disposal, if any (include quantities, if known). Where will this water flow? Will this water flow into other waters? If so describe.
**Stormwater on-site infiltrates to soil during the dry season. Streams and roadside ditches generally have no flows in the summer.**

**Once rains resume in the fall and early winter and soils become saturated, stormwater discharge occurs to wetlands and streams by sheetflow and throughflow.**

**Because there are no impervious surfaces on the site, stormwater runoff is currently not treated or contained. No new impervious surface results from the geotechnical investigation.**

10

To Be Completed                                              For Evaluation
By Applicant                                                 Agency Use Only

    2) Could waste materials enter ground or surface waters? If so, generally describe.

**There is a low probability that drilling mud could reach surface waters if they are disposed of at locations where stormwater sheetflow could move the material to streams or ditches. The drilling mud generally is hard when dry and occurs as small areas of discharge at borehole locations. These locations are more than 200 feet from any of the streams or roadside ditches and areas of thick vegetation buffer the streams and ditches.**

**Hydroseeding will cover the drilling mud, stabilize them and assist in removing the risk of mud moving to surface waters.**

  d. Proposed measures to reduce or control surface, ground, and runoff water impacts, if any;

**Work was performed in July to reduce the risk of large amounts of precipitation occurring that could result in soil erosion and sedimentation. Erosion control methods including hydroseeding and stabilizing site entrances will further reduce risks to surface waters. Restoration of the cleared areas with plantings following the geotechnical investigation will further stabilize soils, reducing risk.**

**Geotechnical investigations yet to be performed will include additional temporary erosion control measures, as needed, such as coir logs, straw bales, and covering any ruts or tracks as soon as work is completed. Site entrances will be stabilized prior to bringing drilling equipment to the site.**

**The site will be inspected and stormwater sampled by a Certified Erosion Control Lead (CECSL) at least monthly or more frequently following Ecology requirements. The CECSL will also provide direction on erosion control methods to the drilling crews.**

4. Plants

  a. Check or circle types of vegetation found on the site:
     __X__  deciduous tree; <u>cottonwood, alder</u>, maple, aspen, other
     __X__  evergreen tree; fir, cedar, pine, other
     __X__  shrubs
     __X__  grass
     __X__  pasture
     __X__  crop or grain (Hay)
     __X__  wet soil plants; cattail, buttercup, bulrush, skunk cabbage, other
     __X__  water plants; water lily, eelgrass, milfoil, other
     __X__  other types of vegetation

  b. What kind and amount of vegetation will be removed or altered?

**Red Alder (average 4 to 6 inches diameter at breast height [DBH]) and black cottonwood (average 20 inches DBH) trees along with a mixed-shrub understory were removed from access pathways across the site. The understory shrubs included salmonberry,**

11

To Be Completed
By Applicant

For Evaluation
Agency Use Only

twinberry, snowberry, Himalayan blackberry, Nootka rose, and elderberry. Also present but in less abundance were vine maple, beaked hazelnut, and hardhack spirea. The herbaceous layer is discontinuous, but where present, it is comprised of swordfern, woodfern, ladyfern, and slough sedge.

Approximately 9.1 acres of vegetation were disturbed including both upland and wetland areas.

c. List threatened or endangered species known to be on or near the site.
There are no threatened or endangered plant species known to be on or near the site.

d. Proposed landscaping, use of native plants, or other measures to preserve or enhance vegetation on the site, if any;
Clearing of access areas resulted in temporary removal of vegetation. Restoration of cleared areas in wetlands and buffer includes hydroseeding with a wetland or upland seed mix as appropriate.

Planting of native wetland trees and shrubs is planned and will include red alder, cottonwood and salmonberry. Buffer areas and upland areas will be replanted with native tree seedlings, including for example red cedar, silver fir, and grand fir.

5. Animals

a. Circle any birds and animals which have been observed on or near the site or are known to be on or near the site:
Birds; hawk, heron, eagle, songbirds, other
Mammals; deer, bear, elk, beaver, other: small mammals
Fish; bass, salmon, trout, herring, shellfish, other

b. List any threatened or endangered species known to be on or near the site.
There are no known threatened or endangered terrestrial species on the site. Threatened and endangered marine species adjacent to the site include:

| Common Name: | Scientific Name: |
| --- | --- |
| Bull trout | *Salvelinus confluentus* |
| Marbled murrelet | *Brachyramphus marmoratus* |
| Chinook salmon | *Oncorhynchus tshawytscha* |
| Steelhead trout | *Oncorhynchus mykiss* |
| Coho Salmon | *Oncorhynchus kisutch* |
| Humpback whale | *Megaptera novaeangliae* |
| Killer whale | *Orcinus orca* |
| Steller sea lion | *Eumetopias jubatus* |
| Leatherback sea turtle | *Dermochelys coriacea* |
| Bocaccio | *Sebastes paucispinis* |
| Canary rockfish | *Sebastes pinniger* |

12

Yelloweye rockfish          *Sebastes ruberrimus*

c.  Is the site part of a migration route? If so, explain.
**The site lies on the Pacific Flyway, which is a general north-south migration route between breeding and wintering grounds for seabirds and shorebirds.**

d.  Proposed measures to preserve or enhance wildlife, if any;
**None are proposed.**

6.  Energy and Natural Resources

a.  What kinds of energy (electric, natural gas, oil wood stove, solar) will be used to meet the completed project's energy needs? Describe whether it will be used for heating, manufacturing, etc.
**The completed project (geotechnical investigation) will not have any energy needs.**

b.  Would your project affect the potential use of solar energy by adjacent properties? If so, generally describe.
**No.**

c.  What kinds of energy conservation features are included in the plans of this proposal? List other proposed measures to reduce or control energy impacts, if any;
**There are no energy impacts from the project and no energy conservation features are included in the plans of the proposal.**

7.  Environmental Health

a.  Are there any environmental health hazards, including exposure to toxic chemicals, risk of fire and explosion, spill, or hazardous waste that could occur as a result of this proposal? If so describe.
**No.**

1)  Describe special emergency services that might be required.
**No special emergency services would be required by the proposed project.**

2)  Proposed measures to reduce or control environmental health hazards, if any;
**There are none required or proposed.**

b.  Noise

1)  What types of noise exist in the area which may affect your project (for example: traffic, equipment, operation, aircraft, other)?
**There is no existing noise in the area that could affect the geotechnical investigation.**

To Be Completed                                                                For Evaluation
By Applicant                                                                   Agency Use Only

2) What types and levels of noise would be created by or associated with the project on a short-term or a long-term basis (for example; traffic, construction, operation, other)? Indicate what hours noise would come from the site.
**Short-term construction noise could be created by the project through the use of geotechnical equipment, clearing equipment and hydroseeding equipment. It is expected that only 2 to 3 pieces of equipment are likely to be operating at any one time. Generation of equipment noise would be limited to normal waking hours.**

3) Proposed measures to reduce or control noise impacts, if any;
**Use of approved construction equipment muffling devices and limitation of construction to normal waking hours would minimize construction-related noise impacts. Noise levels are not anticipated to exceed average existing noise levels in the region.**

8. Land and Shoreline Use

a. What is the current use of the site and adjacent properties?
**Approximately 1/3 of the 1,092-acre property is used for agriculture, including pastures and hayfields. The remaining portions are forested, shrub areas, or abandoned fields and are not developed.**

**An underground oil pipeline and a Bonneville Power Administration transmission line cross the project area approximately north to south. BNSF Railway's Custer Spur line transects the eastern edge of the project area. BP's Cherry Point Refinery and associated industries lie north and west of the property. The ALCOA-Intalco Works (aluminum plant) lies less than 1 mile to the southeast. Large-lot single-family residences lie to the east. Pasture areas owned by others and the Strait of Georgia border the southern property area.**

b. Has the site been used for agriculture? If so, describe.
**Yes, portions of the site are currently and have historically been used for pastures and hayfields.**

c. Describe any structures on the site.
**There are no functioning buildings or structures on the property at this time. There are several foundations-in-ruin on the site. Development in the project area includes County two-lane roadways; ditching, fencing, and short dirt lane access for agriculture; and rail, gas, and electric utility corridors.**

d. Will any structures be demolished? If so, what?
**No.**

e. What is the current zoning classification of the site?
**Heavy Impact Industrial (HII).**

14

To Be Completed                                                    For Evaluation
By Applicant                                                       Agency Use Only

f.  What is the current comprehensive plan designation of the site?
    **Major/Port Industrial Urban Growth Area.**

g.  If applicable, what is the current shoreline master program designation of
    the site?
    **Cherry Point Management Unit.**

h.  Has any part of the site been classified as an "environmentally sensitive"
    area? If so, specify.
    **According to the Whatcom County Critical Areas Maps and
    observations made on site the following are located on the property:**
    - **A small area classified as *"Marine Landslide Hazard Area
      with Modified Shoreline Stability"*,**
    - **Wetlands,**
    - **Streams, and**
    - **Fish and Wildlife Habitat Conservation Areas.**

    **A *Critical Areas Study and Mitigation Plan* addressing these areas is
    being prepared and will be submitted within the week as Exhibit C to
    this document.**

i.  Approximately how many people would reside or work in the completed
    project?
    **No people would reside or work in the completed geotechnical
    investigation.**

j.  Approximately how many people would the completed project displace?
    **The completed project would not displace any people.**

k.  Proposed measures to avoid or reduce displacement impacts, if any:
    **None are proposed.**

l.  Proposed measures to ensure the proposal is compatible with existing
    and projected land uses and plans, if any;
    **This proposal is compatible with existing and project land uses and plans. No
    additional measures are proposed to ensure compatibility.**

9.  Housing

    a.  Approximately how many units would be provided, if any? Indicate
        whether high, middle, or low-income housing.
        **No housing units would be provided by the project.**

    b.  Approximately how many units, if any, would be eliminated? Indicate
        whether high, middle, or low-income housing.
        **No housing would be eliminated.**

    c.  Proposed measures to reduce or control housing impacts, if any;
        **None are proposed.**

15

To Be Completed
By Applicant

For Evaluation
Agency Use Only

10. Aesthetics

  a.  What is the tallest height of any proposed structure(s), not including
      antennas; what is the principal exterior building material(s) proposed?
      **There are no proposed structures associated with the project.**

  b.  What views in the immediate vicinity would be altered or obstructed?
      **None.**

  c.  Proposed measures to reduce or control aesthetic impacts, if any;
      **None are proposed.**

11. Light and Glare

  a.  What type of light or glare will the proposal produce? What time of day
      would it mainly occur?
      **The proposal would not produce any light or glare.**

  b.  Could light or glare from the finished project be a safety hazard or
      interfere with views?
      **No.**

  c.  What existing off-site sources of light or glare may affect your proposal?
      **No existing off-site sources of light or glare would affect the
      proposal.**

  d.  Proposed measures to reduce or control light and glare impacts, if any;
      **None are proposed.**

12. Recreation

  a.  What designated and informal recreational opportunities are in the
      immediate vicinity?
      **Informal recreation opportunities in the immediate vicinity are
      associated with use of the Strait of Georgia and the beach at Gulf
      Road. These include fishing, crabbing, and walking on the beach.**

  b.  Would the proposed project displace any existing recreational uses? If
      so, describe.
      **No.**

  c.  Proposed measures to reduce or control impacts on recreation, including
      recreation opportunities to be provided by the project or applicant, if any;
      **None are proposed.**

13. Historic and Cultural Preservation

  a.  Are there any places of objects listed on, or proposed for, national, state,
      or local preservation registers known to be on or next to the site? If so,
      generally describe.

16

To Be Completed                                                          For Evaluation
By Applicant                                                             Agency Use Only

**Site 45WH1 is located on the property. This site has been the subject of numerous archaeological investigations and has been determined eligible for the National Register of Historic Places (NRHP).**

b.  Generally describe any landmarks or evidence of historic, archaeological, scientific, or cultural importance known to be on or next to the site.
    **Site 45WH1 is a large shell midden dating between 2,500 and 250 years BP. Some artifacts indicate occupation may have begun in the Locarno Beach Phase, up to 3,500 years ago. Ethnographic reports identify this site as a seasonal camp of the Nooksack, the Lummi also consider it to be a traditional habitation site and have expressed a strong interest in protecting the site.**

    **Eleven other sites and two isolated finds were documented during the course of a recent intensive pedestrian survey and subsurface exploration efforts on the property. The sites consist of early to mid-20th Century farmstead foundations-in-ruin, historic refuse piles, and one pre-contact lithic scatter. Recorded isolated finds consist of individual lithic artifacts in both instances. None of the historic period structures in-ruin is recommended as being eligible for listing on the NRHP.**

    **The one pre-contact lithic scatter, 45WH879 was possibly a short-term encampment. Stratigraphy of test excavation units indicates the site has been extensively disturbed. Therefore it has limited potential to yield information important to the pre-history of the region and has been recommended as not eligible for listing on in the NRHP.**

c.  Proposed measures to reduce or control impacts, if any;
    **Buried cultural artifacts such as chipped or ground stone, shell midden, historic refuse, buildings foundations, or human bone could be discovered during the geotechnical investigation. If significant cultural resources were discovered (e.g., human skeletal remains), the contractor would contact the Whatcom County Sheriff, and the affected Native American tribe(s). The Department of Archaeology and Historic Preservation (DAHP) would also be immediately contacted upon discovery of significant cultural resources.**

    **Cultural resources staff has confirmed that clearing for access paths resulted in no new significant cultural resources being discovered. Further geotechnical investigations will be monitored by cultural resources observers.**

14. Transportation

a.  Identify public streets and highways serving the site, and describe proposed access to the existing street system. Show on site plans, if any.
    **Public roads serving the site include Henry Road, Aldergrove Road, Gulf Road, and Kickerville Road.**

17

To Be Completed
By Applicant

For Evaluation
Agency Use Only

b.  Is site currently served by public transit? If not, what is the approximate distance to the nearest transit stop?
    **No. The nearest transit service is Route 55, which runs from Cordata Station to Blaine along Portal Way and Birch Bay-Lynden Road approximately 5 miles away.**

c.  How many parking spaces would the completed project have? How many would the project eliminate?
    **The completed project would not have or eliminate any parking spaces.**

d.  Will the proposal require any new roads or streets, or improvements to existing roads or streets, not including driveways? If so, generally describe (indicate whether public or private).
    **The proposal will not require any new roads or streets or improvements to existing roads or streets.**

    **Access paths for geotechnical equipment are required in the portions of the site with dense vegetation. The access paths were cleared to approximately 17 feet wide to accommodate the equipment and safe operating clearance. In total, approximately 4.3 miles of temporary access paths were cleared on site. The proposal will not require any new access to the site from public roadways.**

e.  Will the project use (or occur in the immediate vicinity of) water, rail or air transportation? If so, generally describe.
    **The project is in the immediate vicinity of water transportation in the Strait of Georgia and BNSF Railway's Custer Spur line but would not use either of these forms of transportation.**

f.  How many vehicular trips per day would be generated by the completed project? If known, indicate when peak volumes would occur.
    **No vehicular trips would be generated by the completed project.**

g.  Proposed measures to reduce or control transportation impacts, if any;
    **None are proposed.**

15. Public Services

a.  Would the project result in an increased need for public services (for example; fire protection, police protection, health care, schools, other)? If so, generally describe.
    **No.**

b.  Proposed measures to reduce or control direct impacts on public services, if any.
    **None are proposed.**

18

To Be Completed                                         For Evaluation
By Applicant                                          Agency Use Only

16. Utilities

    a.  Circle utilities currently available at the site; electricity, natural gas, water, stormwater, refuse service, telephone, sanitary sewer, septic system, other.

    b.  Describe the utilities that are proposed for the project, the utility providing the service, and the general construction activities on the site or in the immediate vicinity which might be needed.
        **There are no utilities proposed for the project.**

C.  SIGNATURE

The above answers are true and complete to the best of my knowledge. I understand that the lead agency is relying on them to make its decision.

Signature: _____

Date Submitted: 16 August 2011 _____

19



**WHATCOM COUNTY**
Planning & Development Services
5280 Northwest Rd., Suite B
Bellingham, WA  98226
360-676-6907

**CUSTOMER RECEIPT**

Receipt:   5201000000000001381

Payor:   PACIFIC INTERNATIONAL TERMIN

Date:   August 16, 2011

| Description | Amount |
|---|---|
| **LDP2011-00054** | |
| Grading permit app | 525.00 |
| NR office review          (B) | 2,400.00 |
| **MIT2011-00015** | |
| CA mit. plan development   (B) | 1,260.00 |
| **SEP2011-00067** | |
| SEPA checklist review     (B) | 370.00 |
| Legal Notice | 100.00 |
| **Total:** | **$ 4,655.00** |

**Check #**  2539669   **Paid**   **$ 4,655.00**

PACIFIC INTERNATIONAL TERMINALS IN

*Thank you!*